UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER REVELS,<br><br>        Plaintiff,<br><br>v.<br><br>HALE, et al.,<br><br>        Defendants. | Case No. 22-cv-06723-JST<br><br>**ORDER DENYING MOTION TO DISMISS FOR LACK OF PROSECUTION; GRANTING REQUEST TO FILE CERTAIN DOCUMENTS UNDER SEAL; GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION; DENYING REQUEST FOR APPOINTMENT OF COUNSEL**<br><br>Re: ECF Nos. 30, 31, 32, 36 |

Plaintiff has filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that Marin County Jail officials Hale, Rajamachvili, Quezada, and Kara were deliberately indifferent to his serious medical needs. Now pending before the Court are the following motions: (1) Defendants' motion for summary judgment and related motion to file certain documents under seal, ECF Nos. 30, 31; (2) Defendants' motion to dismiss for lack of prosecution, ECF No. 32; and (3) Plaintiff's request for appointment of counsel, ECF No. 36. For the reasons set forth below, the Court DENIES as moot Defendants' motion to dismiss for lack of prosecution, ECF No. 32; DENIES Plaintiff's request for appointment of counsel, ECF No. 36; GRANTS Defendants' motion to file certain documents under seal, ECF No. 31; and GRANTS Defendants' motion for summary judgment, ECF No. 30.

**DISCUSSION**

**I.    Procedural Background**

Plaintiff commenced this action on or about October 31, 2022, by filing the complaint docketed at ECF No. 1. At that time, Plaintiff was housed at Marin County Jail. ECF No. 1. On

1  December 26, 2022, the Court dismissed the initial complaint with leave to amend because the
2  initial complaint, among other deficiencies, was a conclusory laundry list of wrongs that Plaintiff
3  allegedly suffered while housed at Marin County Jail; failed to provide the necessary specifics
4  regarding the alleged constitutional violations such as which correctional official committed the
5  alleged violations; and violated the joinder rule set forth in Fed. R. Civ. P. 20(a)(2). ECF No. 7.

6        Plaintiff then filed an amended complaint. ECF No. 13. On July 26, 2023, the Court
7  dismissed the amended complaint with leave to amend because the amended complaint alleged
8  verbal harassment, which does not violate the Eighth Amendment; and because the amended
9  complaint again failed to link the individual defendants to specific constitutional violations. ECF
10  No. 16. On July 31, 2023, Plaintiff filed a notice of change of address with the Court, stating that
11  he was then housed at Santa Rita Jail, in Dublin, California. ECF No. 17.

12        Plaintiff filed a second amended complaint, ECF No. 20, which is the operative complaint.
13  In relevant part, the operative complaint makes the following allegations. On August 7, 2022,
14  Plaintiff was improperly housed on the upper tier of Marin County Jail's Special Housing Unit.
15  As an inmate diagnosed with epilepsy, Plaintiff should have been housed in a lower tier, lower
16  bunk cell. Defendants Marin County Jail captain Hale ignored Plaintiff's request to be housed in a
17  lower tier, lower bunk cell; and nursing supervisor Aleksei Rajmachvili, mental health supervisor
18  Hara, and psychiatrist Rebeca Quezada failed to ensure that Plaintiff was housed in a lower tier,
19  lower bunk cell. On August 7, 2022, Plaintiff suffered a grand mal seizure, followed by an asthma
20  attack due to lack of oxygen. *See generally* ECF Nos. 20, 23. On January 4, 2024, the Court
21  found that the allegation that defendants Hale, Rajmachvili, Hara, and Quezada failed to house
22  him on a lower tier, lower bunk as required to monitor his epilepsy stated a cognizable Eighth
23  Amendment violation, and ordered that these defendants be served. *Id.*

24        On January 17, 2024, the copy of the Court's January 4, 2024 Order sent to Plaintiff was
25  returned to the Court as undeliverable, with a notation that Plaintiff was no longer in the custody
26  of Santa Rita Jail. ECF No. 25.

27        On March 12, 2024, the Court ordered Plaintiff to provide the Court with an updated
28  address, instructing Plaintiff that the Court's local rules required Plaintiff to promptly notify the

1  Court of address changes, and that the failure to do so could lead to dismissal of this case without
2  prejudice.  ECF No. 28.  This order was sent to Plaintiff's address of record at Santa Rita Jail, and
3  again returned as undeliverable with the notation that Plaintiff was no longer in the custody of
4  Santa Rita Jail.  ECF No. 29.
5        On March 12, 2024, Defendants filed a motion for summary judgment, ECF No. 30; an
6  administrative motion to file certain documents under seal, ECF No. 31; and a motion to dismiss
7  for lack of prosecution, ECF No. 32.  On May 14, 2024, Plaintiff filed a notice of change of
8  address, stating that he was now housed at Federal Correctional Institution in Florence, Colorado.
9  ECF No. 33.  On May 30, 2024, Defendants filed a proof of service, attesting that they had served
10 ECF Nos. 30, 31, 32 on Plaintiff at his new address of record.  ECF No. 34.
11       On October 7, 2024, Plaintiff filed a pleading requesting CJA appointment of court-
12 appointed counsel and a competency hearing.  ECF No. 36.  Plaintiff alleges that a competency
13 hearing would reveal that Plaintiff was incompetent to proceed in this action within the meaning
14 of 18 U.S.C. § 4241(A); and that there is objective evidence to indicate that he is suffering "from
15 mental defects that render him mentally incompetent to the extent that he is unable to understand
16 the nature and consequences of the court proceedings and is unable to assist properly in forming
17 and writing pleadings as a pro se litigant pursuant to his medical and mental health records and
18 Marin County forensic competency report."  *Id.*
19       Plaintiff has not filed an opposition to any of Defendants' pending motions.
20 **II.     Defendants' Motion to Dismiss for Lack of Prosecution (ECF No. 32)**
21       On April 12, 2024, Defendants filed a motion requesting that the Court dismiss this action
22 for lack of prosecution pursuant to Fed. R. Civ. P. 41(b) because, as of that date, Plaintiff had not
23 provided a current address for service and his last contact with the Court had been on August 30,
24 2023.  ECF No. 32.  Plaintiff has not opposed this motion.  But, on May 14, 2024, a month after
25 this motion was filed, Plaintiff filed a notice of change of address, stating that he is now housed at
26 Federal Correctional Institution in Florence, Colorado.  ECF No. 33.  Plaintiff has not filed any
27 opposition to Defendants' other pending motions although, as just noted, on October 7, 2024,
28 Plaintiff filed a motion requesting appointment of counsel and an evidentiary hearing.  ECF No.

3

36.

The Court DENIES the motion to dismiss for lack of prosecution as moot because Plaintiff has since informed the Court and Defendants of his current address of record and has sought appointment of counsel in order to continue prosecuting the action.

The Court also denies the motion on the merits. The Court considers five factors when determining whether to dismiss an action under Fed. R. Civ. P. 41(b): (1) the public interest in the expeditious resolution of the litigation: (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the availability of less drastic sanctions; and (5) the public policy favoring the disposition of actions on their merits. *See Malone v. United States Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987). The first, second, and third factors – expeditious resolution of the litigation, the Court's need to manage its docket, and prejudice to the defendants – do not weigh in favor of either party. Although this case was commenced two and a half years ago, service was not ordered until one year and three months ago, and Defendants appeared in this action a year ago. This case has not unduly impacted the Court's ability to manage its docket. Defendants have not demonstrated how a five-month delay in being able to reach Plaintiff caused them prejudice. Defendants were able to file a summary judgment motion addressing the merits of this action without contacting Plaintiff. The fourth and fifth factors – availability of less drastic sanctions and the public policy favoring the disposition of actions on their merits – weigh against dismissal. And, as explained further below, the record indicates that Defendants are entitled to judgment in their favor on the merits of this action.

### III. Defendants' Motion to File Certain Documents Under Seal (ECF No. 31)

Defendants have requested to file under seal Plaintiff's electronic medical records which are attached as Exhibit 1 to their motion to seal. ECF No. 31. Defendants argue that sealing these documents is appropriate because the medical records are confidential pursuant to the Health Insurance Portability and Accountability Act of 1996; that the public's interest in access to an individual's medical records is minimal; none of the documents would generally be disclosable to the public without Plaintiff's permission; the government has a compelling interest to encourage individuals to be candid with their healthcare providers and that interest is protected by the Court

4

limiting the public's access to Plaintiff's medical records; and that the Court has the authority to seal the documents based upon its inherent supervisory authority over its own files and records. because Plaintiff's medical and psychiatric treatment records are sensitive and confidential. *See generally* ECF No. 31. Plaintiff has not opposed this motion.

When considering a motion to seal, "a strong presumption in favor of access is the starting point." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006) (citation and quotation omitted). To overcome this strong presumption, the moving party must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Id.* at 1178-79 (internal quotation marks and citation omitted).

The Court finds that there are compelling reasons to grant the request to file under seal. The need to protect medical privacy qualifies as a compelling reason for sealing records. *See, e.g., Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200, 1210 (9th Cir. 2024) ("protecting an individual's constitutional and statutory right to privacy is a compelling interest that may justify sealing a particular medical or health record"). The Court therefore GRANTS Defendants' motion to file under seal Plaintiff's electronic health records which are attached as Exhibit 1 to the administrative motion to seal. These documents shall remain under seal until the conclusion of this case and any appellate proceedings. If counsel for Defendants does not request that the documents be returned following the conclusion of this case and any appellate proceedings, the documents will be destroyed in conformance with the normal records destruction policy of the United States Courts.

**IV.     Plaintiff's Request for Appointment of Counsel (ECF No. 36)**

On October 7, 2024, Plaintiff filed a one-page pleading requesting CJA appointment of court-appointed counsel and a competency hearing. Plaintiff alleges that a competency hearing would reveal that Plaintiff was incompetent to proceed in this action within the meaning of 18 U.S.C. § 4241(A); and that there is objective evidence to indicate that he is suffering "from mental defects that render him mentally incompetent to the extent that he is unable to understand the nature and consequences of the court proceedings and is unable to assist properly in forming and

5

writing pleadings as a pro se litigant pursuant to his medical and mental health records and Marin County forensic competency report." ECF No. 36.

The Court DENIES Plaintiff's request for counsel. Neither the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, nor 18 U.S.C. § 4241(A) are applicable here. The CJA and 18 U.S.C. § 4241(A) apply only to federal criminal proceedings, whereas this action is a federal civil case. Nor has Plaintiff demonstrated entitlement to counsel in this case. In a civil case, there is no constitutional right to counsel unless an indigent litigant may lose his physical liberty if he loses the litigation. *See Lassiter v. Dep't of Social Svcs.*, 452 U.S. 18, 25 (1981). A court "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). Appointing counsel is within the court's discretion and is granted only in exceptional circumstances. *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986) (referring to 28 U.S.C. § 1915(d), which was subsequently renumbered 28 U.S.C. § 1915(e)(1)). A finding of "exceptional circumstances" requires an evaluation of the likelihood of the plaintiff's success on the merits and an evaluation of the plaintiff's ability to articulate his claims *pro se* in light of the complexity of the legal issues involved. *See Agyeman v. Corrections Corp. of America*, 390 F.3d 1101, 1103 (9th Cir. 2004). Both of these factors must be viewed together before reaching a decision on a request for counsel under § 1915. *See id*. While the Court recognizes that these factors are intertwined, in this particular case the Court concludes that Plaintiff's lack of likelihood of success on the merits precludes the Court from finding the exceptional circumstances required for the appointment of counsel. The Court therefore DENIES Plaintiff's request for appointment of counsel. ECF No. 36.

**V.    Defendants' Motion for Summary Judgment (ECF No. 30)**

    **A.    Summary Judgment Standard**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

6

1    nonmoving party. *See id.*

2        A court shall grant summary judgment "against a party who fails to make a showing
3    sufficient to establish the existence of an element essential to that party's case, and on which that
4    party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an
5    essential element of the nonmoving party's case necessarily renders all other facts immaterial."
6    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial
7    burden of identifying those portions of the record that demonstrate the absence of a genuine issue
8    of material fact. *Id.* The burden then shifts to the nonmoving party to "go beyond the pleadings
9    and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on
10   file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324
11   (citing Fed. R. Civ. P. 56(e)). "A scintilla of evidence or evidence that is merely colorable or not
12   significantly probative does not present a genuine issue of material fact" precluding summary
13   judgment." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

14       For purposes of summary judgment, the court must view the evidence in the light most
15   favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *AXIS*
16   *Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 844 (9th Cir. 2020). If, as to any
17   given material fact, evidence produced by the moving party conflicts with evidence produced by
18   the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving
19   party with respect to that material fact. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).
20   However, facts must be viewed in the light most favorable to the nonmoving party only if there is
21   a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The court's
22   function on a summary judgment motion is not to make credibility determinations or weigh
23   conflicting evidence. *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

### B. Legal Standard for Eighth Amendment Violations

25       Deliberate indifference to a prisoner's serious medical needs violates the Eighth
26   Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S.
27   97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on*
28   *other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en

banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059. A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060. Under the relevant standard, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 ("A prison official's duty under the Eighth Amendment is to ensure reasonable safety") (internal quotation marks and citation omitted). To be deliberately indifferent, a prison official must have a subjective "state of mind more blameworthy than negligence," akin to criminal recklessness. *Id.* at 835, 839-40.

### C. Factual Background

The following facts are undisputed.

Upon being received into custody by Marin County Sheriff's office, inmates are classified according to their needs and according to the risks they present to the safety and security of the jail population and staff. Inmates' housing placements depend on their classification, medical needs and security concerns. ECF No. 30-2 ("Husk Decl."), ¶ 3. Medical staff, including defendant registered nurse Rajamachvili, are not involved in determining inmate classification or housing, in part because classification and housing have no effect on medical staff's ability to monitor and

care for inmates. ECF No. 30-3 ("Rajamachivili Decl."), ¶ 7. During the relevant time period, Marin County Sheriff's Office classification deputy Jeffrey Husk was responsible for inmate classification and inmate housing assignments. Husk Decl., ¶ 3.

Marin County Jail housing units consist of six pods: Pods A, B, C, and F; a Special Housing ("SH") pod; and a Restricted Housing ("RH") pod. A, B, and C pods house male inmates classified for general population. Pod F houses female inmates. Generally speaking, inmates are housed in RH or SH pods if they have a medical or security need that requires more careful monitoring. The SH pod primarily houses inmates with mental health conditions or special medical needs. The RH pod houses inmates who have been violent or disruptive, or pose a security concern. Inmates housed in the RH and SH pods typically have their own cells and do not share upper and lower bunks, although exceptions are made if required by space constraints or other variables. Inmates housed in the RH and SH pods are also monitored more closely by jail staff. The RH and SH pods have individual deputies assigned to monitor the pods 24 hours a day. In contrast, the three general population pods do not have a deputy present when all inmates are secured in their cells. Husk Decl., ¶¶ 4, 5.

Qualified nursing staff are available to inmates 24 hours a day, seven days a week. Rajamachvili Decl. ¶ 6. Whether an inmate is housed in the RH and SH pods has no medical significance. Medical staff may recommend SH housing, instead of general population housing, if an inmate has medical needs that require more careful monitoring. However, an inmate in the SH pod may be reclassified and moved to the RH pod for administrative or security reasons. Rajamachvili Decl. ¶ 6.

On August 1, 2022, Plaintiff was transferred into the custody of Marin County Jail. During the initial intake conducted by RN Fetterly, Plaintiff stated that he was epileptic; that his last seizure had been on October 19, 2021; and that he was prescribed, and took, a twice daily dose of 1000 mg Keppra to manage the seizures.[1] ECF No. 31-3 at 287, 290. RN Fetterly entered into Plaintiff's medical notes that Plaintiff should be housed in a bottom bunk and on the lower tier, due to his self-reported history of seizures. Husk Decl., ¶ 7; ECF No. 31-3 at 295. Plaintiff was

---

[1] The Court does not address the other medical conditions and medications reported by Plaintiff at the initial intake, as they are not relevant to the issues in this action.

placed in general population housing in C pod. ECF No. 30-2 at 5. The record is silent as to whether Plaintiff was placed in a bottom bunk and on the lower tier while housed in C pod. On August 2, 2022, the outside pharmacy informed jail staff that while Plaintiff had an active prescription for Keppra, Plaintiff had never picked up the prescription. ECF No. 31-3 at 277.

On August 3, 2022, Plaintiff broke the chair in his cell after throwing it; destroyed his mattress; and bent the metal stool. Plaintiff was placed in a safety cell in the SH pod. ECF No. 30-2 at 5; ECF No. 31-3 at 267-68. On August 4, 2022, Plaintiff punched the wall and broke the court metal detector by pushing it over. ECF No. 30-2 at 5.

From August 3 to 7, 2022, Plaintiff's medical records indicate that he complained to medical staff about the following concerns: his fifth left toenail had come off; abdominal pain, nausea, and burning upon urination, which he believed was due to having contracted herpes from his girlfriend; blood in his urine; kidney problems; and PTSD. Plaintiff repeatedly informed medical staff that he needed to be sent to the hospital for treatment. Plaintiff refused to be physically examined to confirm his claim of herpes. After observation, medical staff decided not to send him to the hospital, as Plaintiff was able to eat full meals and no blood was observed in his urine. ECF No. 31-3 at 251-96.

On August 7, 2022, the day referenced in the complaint, Plaintiff was housed on the upper tier of the Special Housing pod, in Cell No. 19. ECF No. 20 at 1. Plaintiff and Defendants' version of the events of this day differ.

In the operative complaint, Plaintiff describes the day as follows:

> On August 7, 2022, I Tyler Revels was housed in MCJ's Special Housing Unit, Upper Tier, Cell No. 19. As an inmate that is diagnosed with epilepsy, it is nursing supervisor Aleksei Rajmachvili and Nurse Practitioner Joseph Bieleselo's duty to house inmates on lower tier, lower bunk to supervise seizure disorders.
>
> Around 11:00 a.m. that day, I experienced both a grand mal seizure and an anxiety attack. Pod workers and inmates notified the pod deputy and multiple jail deputies, nursing staff, and a sergeant were summoned.
>
> As I recovered from the seizure, I suffered from an asthma attack due to a lack of oxygen. There was a 20 minute delay in medical care being provided to me. Medical staff were unsuccessful in controlling my asthma attack.

10

> My blood pressure was elevated. I was unable to speak, get up or walk due to my asthma attack. Which cause [sic] unknown deputies to grab me and sit me up so medical staff could administer breathing treatments.

ECF No. 20 at 2.

Defendants have no record of Plaintiff suffering a seizure on that day. But Defendants agree that Plaintiff reported suffering an asthma attack that day. Plaintiff's medical records describe the asthma attack as follows: Sometime during the morning of August 7, 2022, Plaintiff complained of shortness of breath. Around 11:00 a.m., Plaintiff was administered albuterol via a metered-dose inhaler. At approximately 11:59 a.m., RN Zuccarello arrived at Plaintiff's pod. RN Zuccarello observed Plaintiff sitting on his cell floor, with elevated breathing and audible wheezing. RN Zuccarello examined Plaintiff and noted that he had an elevated blood pressure that remained elevated. His pulse rate was measured at 150. A second nurse arrived with a nebulizer, and Plaintiff was administered Atrovent via a nebulizer. Initially, no improvement was noted in Plaintiff's breathing, but Plaintiff's pulse rate decreased to 110-120. During the nebulizer treatment, medical staff noticed that Plaintiff was not inhaling with his lips sealed around the mouthpiece. Plaintiff was instructed several times to use the mouthpiece like a straw and to slow down his breathing, but Plaintiff did not follow the directions. Plaintiff wrote notes to RN Zuccarello during the nebulizer treatment. One note stated a need for Imitrex for migraine. There was no order in Plaintiff's medical chart authorizing this medication. The final note stated that Plaintiff was feeling better. At 12:39 p.m., Plaintiff's respiration returned to normal, his blood pressure was 128/80, and his pulse rate was 98. Plaintiff reported to RN Zuccarello that he was feeling better. Medical staff reported Plaintiff's asthma attack to the FNP, and the FNP prescribed Vistaril for "possible compounding anxiety" and two Tylenol for headache. Medical staff checked on Plaintiff around 1:29 p.m. and reported that Plaintiff showed no sign of respiratory distress, that he was walking around his cell, and that he took his medication without issue. ECF No. 31-3 at 251-53.

On or about August 16, 2022, Plaintiff informed nurse practitioner Joseph Bielfeld that he had a history of being on seizure medication. In response, NP Bielfeld started Plaintiff on anti-

1 convulsant medication Keppra. Husk Decl., ¶ 4; Rajamachvili Decl., Ex. 1 at 241. Plaintiff
2 repeatedly refused to take his seizure medication. Rajamachvili Decl., Ex. A at 68, 89, 179, 211,
3 218. On September 8, 2023, nurse Bielfeld met with Plaintiff and discussed with him the risks
4 and benefits of non-treatment. Bielfield Decl., ¶ 4 [ECF No. 30-4 at 2]. On the morning of
5 September 21, 2022, Plaintiff again refused his Keppra dosage. Plaintiff told RN Bielfield that he
6 was no longer taking Keppra for seizure; that he had last taken Keppra nine months ago; and that
7 his neurologist had discontinued his Keppra medication. ECF No. 31-3 at 211-12. In the evening
8 of September 21, Plaintiff informed RN Fetterly that he needed his seizure medication. RN
9 Fetterly informed him that the Keppra had been discontinued as Plaintiff had refused the
10 medication the past three days. Plaintiff demanded his seizure medication, stating he would never
11 refuse his Keppra, and that he needed Keppra because of his seizure history. RN Fetterly
12 informed the FNP of Plaintiff's statements, and the Keppra prescription was continued. ECF No.
13 31-2 at 210.

14 On September 29, 2022, Plaintiff was moved to administrative segregation, i.e., the
15 Restrictive Housing pod, because of his confrontational attitude towards staff and rude and vulgar
16 remarks to nursing staff. ECF No. 30-2 at 7.

17 Throughout October 2022, Plaintiff again refused his Keppra medication. ECF No. 31-3 at
18 196, 200-01.

19 On October 7, 2022, Plaintiff submitted a grievance complaining that custody staff had
20 caused him to suffer a seizure and requesting that he be moved to Special Housing Unit and
21 assigned a "lower tier, lower bunk to avoid falls in the nighttime":

> I have informed staff that I am epileptic and might have seizures. Deputy Hector Garcia-Carillo #S01880 flashed his flashlight deliberately in my eyes knowing I'm in an unpadded cell. In my unpadded cell I suffered a migraine from my head repeatedly banging against the hard floor during grand mal seizure. As I regained consciousness I informed Deputy Collin Medalie #S01635 that deputy Garcia deliberately flashed his flashlight into my eye causing me to have a grand mal seizure. I'm requesting to be in special housing so my seizure condition can be closely monitored 24/7 and also that I be assigned lower tier lower bunk in SH to avoid falls during nighttime seizures!!!!!!!

28 Alacala Decl., Ex. 1 [ECF No. 30-1 at 3]. The grievance was forwarded to medical that same day.

Alacala Decl., Ex. 1 [ECF No. 30-1 at 3].

On October 8, 2022, in response to Plaintiff's grievance, a deputy attempted to move Plaintiff to a lower bunk on a lower tier. Plaintiff refused the move and threatened the deputy, "Open the cell with your key and I can really show you what I'm about." Plaintiff remained in his cell. Husk Decl., Ex. 1 at 4 [ECF No. 30-2 at 8].

On October 12, 2022, defendant Rajamachvili reviewed Plaintiff's grievance requesting a move to a lower tier, lower bunk. Because Plaintiff was prescribed anti-convulsant medication, defendant Rajamachvili agreed that Plaintiff should be moved to a cell on the lower tier to avoid having to climb stairs. Defendant Rajamachvili was informed that jail officials had offered to move Plaintiff to a lower tier, but Plaintiff had refused when he learned that he would still remain in Restricted Housing. Rajamachvili Decl., ¶ 5 [ECF No. 30-3 at 2]. That same day, Plaintiff's grievance was returned to him with a response from defendant Rajamachvili, stating as follows:

> Medical and custody staff aware about your medical conditions and we care about your wellbeing and closely monitoring your seizure problem. You refused to move multiple times to a lower tier.

Alacala Decl., Ex. 1 [ECF No. 30-1 at 3].

On October 16, 2022, deputies again tried to move Plaintiff down to the first tier. Plaintiff refused to leave his cell. As a result, Plaintiff was denied his free-time. Plaintiff told the deputy that he would comply with the move if he was re-classified from Restrictive Housing to Special Housing. Later that day, Plaintiff was seen using a fishing line to inmate Flournoy's cell. Husk Decl., Ex. 1 at 10-11 [ECF No. 30-2 at 10-11].

On October 18, 2022, while Plaintiff was out to Court, a sheriff's deputy moved Plaintiff to a bunk on the first tier. Jail records state that the move was due to Plaintiff's medical restriction from his epilepsy, and his history of claiming seizures. When Plaintiff returned from court, he initially refused to go to his lower-tier cell and demanded to speak with a sergeant. A sergeant arrived and was able to convince Plaintiff to go to his assigned cell on the first floor. Husk Decl., Ex. 1 at 11 [ECF No. 30-2 at 11].

During the August 1, 2022 to October 18, 2022 time period, Marin County Jail deputy Husk interacted with Plaintiff on a near daily basis. Deputy Husk did not see Plaintiff experience

physical limitations from being housed on the second floor of Restricted Housing, and did not witness Plaintiff complaining about using the stairs. Husk Decl., ¶ 9 [ECF No. 30-2 at 2].

According to the jail medical records, defendant Quezada reviewed Plaintiff's psychiatric medications and medical records and/or met with Plaintiff for an in-person evaluation on the following dates: August 2, 5, 12; and September 14, 20, 21, 23, 30. She initially continued Plaintiff's prescriptions for Cymbalta and Prazosin, and then discontinued the Prazosin prescription at Plaintiff's request. ECF No. 31-3 at 203, 209, 214-15, 217, 219, 222, 246, 255-56, 278.

The jail medical records are silent as to what interactions defendant RN supervisor Rajamachvili and mental health supervisor Hara had with Plaintiff. The record is also silent as to what interactions defendant Marin County Jail captain Hale had with Plaintiff. Outside of Plaintiff's allegation in the operative complaint, there is no evidence that, prior to October 7, 2022, Plaintiff informed defendant Hale, or any other correctional official that he was unsafely housed on the upper tier.

### D.     Analysis

Defendants argue that they are entitled to summary judgment as follows.

First, Defendants argue that Plaintiff cannot show that Defendants disregarded a risk of serious harm from Plaintiff being housed on the ground floor. When Plaintiff filed a grievance on October 7, 2022, requesting that he be assigned to a lower tier, lower bunk to avoid falls in the nighttime, jail officials responded by attempting to move Plaintiff to a lower tier the next day, October 8. Plaintiff refused to move to a lower tier and threatened the deputy who attempted to effect the move. On October 16, 2022, jail officials again attempted to move Plaintiff to a lower tier. Plaintiff again refused to move, stating that he would only agree to the move if he were reclassified from Restricted Housing to Special Housing. Plaintiff's placement in Special Housing had no effect on the ability of medical staff to monitor his condition. Plaintiff's condition did not put him at risk regardless of where he was housed as he exhibited no symptoms of epilepsy and did not take his own condition seriously, as he repeatedly refused to take his epilepsy medication. Even assuming the truth of the allegation in the complaint that Plaintiff suffered an epileptic

14

seizure, there is no evidence that Plaintiff suffered any injury because of his housing placement or bunk configuration.

Second, Defendants argue that they are entitled to qualified immunity because no case establishes that "Defendants, as jail custodial and medical staff, had an obvious and *sua sponte* duty under the Eighth Amendment to force any inmate who claims to have epilepsy to be housed in a cell on the first floor even if he or she refused." ECF No. 30 at 7.

Third, Defendants argue that Plaintiff cannot prove a constitutional violation against Defendants in their official capacities, as he has not alleged, much less established, an official policy, custom, or practice of not housing epilepsy inmates on a lower floor. *See generally* ECF No. 30.

Plaintiff has not filed an opposition to the summary judgment motion. Plaintiff has not provided any evidence to support the allegations made in his complaint, or to refute Defendants' factual allegations or legal arguments.

Defendants' summary judgment motion focuses solely on events that occurred in early October 2022. ECF No. 32. However, the operative complaint solely discusses events that took place on August 7, 2022. ECF No. 20. Regardless of whether the relevant time period is August 1 to 7, 2022 (the date Plaintiff was received into the custody of Marin County Jail to the date referenced in the complaint) or August 1, 2022 to October 8, 2022 (the date Plaintiff was received into the custody of Marin County Jail to the date jail officials attempted to move Plaintiff to a lower tier), the record does not support the operative complaint's claim that defendants Marin County Jail captain Hale, nursing supervisor Rajamachvili, mental health supervisor Hara, and psychiatrist Quezada refused to house Plaintiff on a lower bunk, in deliberate indifference to Plaintiff's serious medical needs. An Eighth Amendment violation requires that the prison official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and draws the inference. *Farmer*, 511 U.S. at 837. Here, there is no evidence that the individual defendants were responsible for housing Plaintiff on the upper tier; or that they were aware that Plaintiff had epilepsy; or that they knew that housing Plaintiff on an upper tier put him at substantial risk of serious harm. In fact, there is no evidence in the record at all regarding

15

Plaintiff's interactions with defendants Hale, Rajamachvili, or Hara. According to Plaintiff's medical records, defendant Quezada interacted with Plaintiff regularly to manage his psychiatric medications. But there is no evidence that defendant Quezada was aware that Plaintiff was at substantial risk of serious harm from being housed on the lower tier.

Perhaps Defendants should have been aware of the risk of harm because Plaintiff's medical records reported that he had epilepsy and was prescribed anti-convulsants. But if a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson*, 290 F.3d at 1188.

Moreover, nothing in the record indicates that Plaintiff complained about his upper tier housing until his October 7, 2022 grievance; or otherwise informed jail officials, including Defendants, that his housing placement put him at substantial risk of serious harm.

Viewing the record in the light most favorable to Plaintiff, the Court finds that there is no triable issue of material fact as to whether Defendants were responsible for housing Plaintiff on an upper tier; or were aware that housing Plaintiff on an upper tier put him at substantial risk of serious harm; or otherwise failed to treat Plaintiff's serious medical needs arising from his epilepsy. Accordingly, there is no triable issue of material fact as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs, in violation of the Eighth Amendment. As there was no constitutional violation, the Court declines to reach Defendants' remaining arguments. The Court GRANTS Defendants' motion for summary judgment.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion to file certain documents under seal, ECF No. 31; and DENIES as moot Defendants' motion to dismiss for lack of prosecution, ECF No. 32; DENIES Plaintiff's request for appointment of counsel, ECF No. 36; and GRANTS Defendants' motion for summary judgment, ECF No. 30. Judgment is entered in

/ / /

/ / /

/ / /

/ / /

16

1  favor of Defendants and against Plaintiff.  The Clerk shall terminate any pending motions as moot
2  and close the case.
3  **IT IS SO ORDERED.**
4  Dated:  March 17, 2025



JON S. TIGAR
United States District Judge

17